701 P.2d 1025

T. Bruce BENTON, Plaintiff-Appellant,

v.

ALBUQUERQUE NATIONAL BANK, Administrator and Trustee of the Trust of Isobel M. Suber a/k/a Isobel Benton; and Frank R. Stubbs; and Robert P. Friggens, Defendants-Appellees.

No. 7849.

Court of Appeals of New Mexico.

April 11, 1985.

Certiorari Quashed June 14, 1985.

Stuart Hines, Albuquerque, for appellees
Stubbs and Friggens.

Douglas G. Voegler, Marchiondo & Berry, P.A., Albuquerque, for appellant.

Paul W. Robinson, Sherrie L. Tepper, Robinson & Wainwright, P.A., Albuquerque, for appellee Albuquerque Nat. Bk.

## OPINION

DONNELLY, Chief Judge.

Plaintiff, T. Bruce Benton, appeals from a judgment pronouncing that he owned no legal interest in an apartment building and had no right to any of its profits or rents. Two issues are presented on appeal: (1) failure to find that plaintiff was vested with a valid assignment of a partnership interest; and (2) error in allowing testimony of witnesses undisclosed to plaintiff before trial. Resolution of the first issue renders discussion of the second issue unnecessary. Reversed and remanded.

### FACTS

On June 13, 1949, J.T. Benton (plaintiff's father) and Isobel M. Suber, a single woman, entered into a written partnership agreement involving an apartment building located on Coal Avenue in Albuquerque. The land referred to in the partnership agreement had been initially conveyed by warranty deed from third parties to Suber as sole named grantee on December 21, 1948.

The apartments were jointly purchased by J.T. Benton and Suber. The partnership agreement recited in part:

1– It is mutually agreed that the intire [sic] property located at 1701 East Coal Avenue, including furnishings of apartment number one (1) and apartment number two (2) has cost the sum of twenty-two thousand, one hundred twenty-seven dollars. ($22,127.00)

2– It is further agreed that J.T. Benton has paid his share in full in the amount of eleven thousand-sixty-three dollars-fifty cents ($11,063.50) and that Isobel M. Suber has paid the amount of one thousand-one hundred forty-one dollars (1141.00)[.]

The partnership agreement also provided that Suber could live in one apartment rent-free in exchange for managing the apartments, and that all income from two of the apartments would be used to liquidate an outstanding $10,000 mortgage on the property. The agreement further specified that "[i]t is also agreed that at the time the [$10,000 mortgage] loan is liquidated * * * the partners shall share and share alike in the ownership of said property and in all further income derived from rents of same."

On October 11, 1956, J.T. Benton sought to assign his interest in the partnership to plaintiff, by writing on the front page of the partnership agreement:

Assigned to Bruce Benton 10/11/56- In case of my death, Isobel Suber may liquidate this partnership by paying $10,000 in addition to the $10,000 mortgage which was later made on this property.

Signed J.T. Benton

J.T. Benton and Isobel Suber married on September 21, 1957. Thereafter, on February 25, 1959, plaintiff's father executed and delivered a quitclaim deed to Suber, purporting to convey his interest in the apartment building and lot.

J.T. Benton died on March 14, 1968, leaving as his survivors, his wife, Isobel Suber, and two children by a prior marriage, plaintiff and Elizabeth Cashion. Plaintiff petitioned the probate court in Bernalillo County for letters of administration in his father's estate and presented a holographic will authored by J.T. Benton and dated October 11, 1957. The will was signed by decedent and duly witnessed by two persons. The will was admitted to probate and decedent's estate was duly settled. Decedent's will provided in applicable part:

(1) whereas I am the owner and holder of a first lien mortgage of the sum of $10,000 upon the apartment house * * * owned by my beloved wife Isobel Suber Benton as her separate property, I wish said $10,000 to go to and be the sole property of the said Isobel Suber Benton.

Subsequently, on June 6, 1968, plaintiff recorded the original copy of the partnership agreement with the Bernalillo County Clerk. The agreement included the handwritten assignment to plaintiff. Several years later, on October 31, 1980, Suber sold the apartment building to defendants Frank R. Stubbs and Robert P. Friggens under a real estate contract. On January

26, 1982, Suber assigned the real estate contract to the Albuquerque National Bank directing that it hold the contract and all its proceeds in trust on her behalf. Suber died a few months later on July 30, 1982.

The trial court in the present case adopted findings of fact and conclusions of law determining that plaintiff had no interest in the realty or its profits. The court's findings *inter alia* provided:

1. That in 1949, as evidenced by plaintiff's Exhibit 43, J.T. Benton and Isobel Suber entered into a partnership covering the property involved in this lawsuit.

2. That the terms of the partnership between Isobel Suber and J.T. Benton are clear and self-explanatory, as shown in plaintiff's Exhibit 43.

3. That even though the property in this lawsuit was carried of record in the name of Isobel Suber, it was the property of the partnership between J.T. Benton and Isobel Suber formed on or about June 13, 1949.

4. That the property involved in this matter is * * * commonly known as 414 South Pine or 1701 East Coal.

5. That Isobel Suber and J.T. Benton were equal partners and had equal rights to ownership of such property by virtue of the partnership agreement.

\* \* \* \* \* \*

7. That the assignment dated October 11, 1956, was duly notarized on October 11, 1956, [and] such acknowledgement * * * placed on the reverse side of [partnership agreement and assignment] Exhibit 43.

\* \* \* \* \* \*

12. That Isobel Suber gave no value for the quitclaim deed given to her on February 25, 1959, by J.T. Benton.

\* \* \* \* \* \*

20. That in 1980, Isobel Suber sold the property involved in this matter to defendants Stubbs and Friggens * * *.

21. That the entire world, including Isobel Suber and defendants Stubbs and Friggens, had constructive notice subsequent to June 6, 1968, of the mutual partnership agreement and its assignment in 1956 to T. Bruce Benton.

22. That defendants Stubbs and Friggens made no efforts prior to their purchase of the property involved in this action to ascertain from public documents if Isobel Suber's claim that she owned the property free and clear was valid.

\* \* \* \* \* \*

24. That a routine title search, as shown by Exhibits 41 and 42, would have revealed or disclosed the mutual partnership agreement and 1956 assignment thereof, recorded in 1968.

\* \* \* \* \* \*

28. That T. Bruce Benton had no knowledge that Isobel Suber had sold this property until shortly before or shortly after her death in 1982.

29. That Bruce Benton was obligated to advise Isobel Suber of the options given to her to liquidate the partnership, that Bruce Benton did not do so.

30. That had [plaintiff] advised Isobel Suber of the option to liquidate the partnership, she would have.

31. That J.T. Benton intended the 1956 assignment to be his last will and testament.

32. That the 1956 assignment was invalid as a last will and testament.

The trial court concluded that the 1956 assignment to plaintiff by his father was a purported testamentary disposition and "as such was null and void because it was not duly executed as a will." The court concluded that the subsequent "1959 quitclaim deed divested J.T. Benton of his interest in the property," and that the plaintiff, due to his failure to assert any claim against or ownership in the property, should be barred from pursuing his claims under the doctrines of laches, estoppel, waiver, and collateral estoppel.

The decision entered on behalf of the defendants contained several conclusions inconsistent with the conclusions quoted in the preceding paragraph. The trial court

concluded that as of "June 6, 1968, Isobel Suber, defendants Stubbs and Friggens, and the entire world had constructive notice of the * * * partnership agreement and the 1956 assignment thereof." The court also concluded that Isobel Suber "was not a bona fide purchaser for value of the 1959 quitclaim deed from J.T. Benton."

## VALIDITY OF ASSIGNMENT

Did the 1956 assignment convey an interest in the property or was the assignment an invalid attempt to make a testamentary disposition of the property which failed due to technical inadequacies within the document?

■ An assignment is an act or expression of intention by which one person causes a transfer of a right or interest in property. *In re Estate of Boyd*, 606 P.2d 1243 (Wyo.1980). A partner's interest in a partnership is a property right and may be conveyed to a third person. NMSA 1978, §§ 54-1-24, -26, -27. *See also In re Decker*, 295 F.Supp. 501 (W.D.Va.1969); J. Crane & A. Bromberg, *Law of Partnership*, ch. 4, § 42 at 235 (1968). As stated in Section 54-1-27(A):

> A conveyance by a partner of his interest in the partnership *does not of itself dissolve the partnership*, nor, as against the other partners in the absence of agreement, entitle the assignee, during the continuance of the partnership, to interfere in the management or administration of the partnership business or affairs, or to require any information or account of partnership transactions, or to inspect the partnership books; but it *merely entitles the assignee to receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled.* [Emphasis added.]

■ An assignment of a partnership interest does not give the assignee the status of a partner, nor may an assignee become a partner without the consent of the other partners. *Hammond Oil Co. v. Standard Oil Co. of New Jersey*, 259 N.Y. 312, 181 N.E. 583 (1932). A partner is a co-owner with his partners of specific partnership property holding as a tenant in partnership. *Stephen v. Phillips*, 101 N.M. 790, 689 P.2d 939 (Ct.App.1984). A partner's right in specific partnership property is not assignable except in connection with the assignment of rights of all of the partners in the same property. NMSA 1978, § 54-1-25. *See also* Annot., 39 A.L. R.2d 1365 (1955). An assignee of a partner's interest in a partnership merely becomes the owner of the assignor's share of the partnership. This interest consists of the share of the partnership surplus remaining after the payment of partnership debts and the adjustment of the equities of the several partners. *Manderfield v. Field*, 7 N.M. 17, 32 P. 146 (1893) (citing law as it existed prior to adoption of the Uniform Partnership Act). *See also Terral v. Terral*, 212 Ark. 221, 205 S.W.2d 198 (1947).

■ The language of an assignment of a partnership interest may be informal so long as the language utilized, coupled with the surrounding circumstances, reveals an intent by the owner to transfer a present interest in the partnership. *Seasons, Inc. v. Atwell*, 86 N.M. 751, 527 P.2d 792 (1974); *E.g., S & W Trucks, Inc. v. Nelson Auction Service, Inc.*, 80 N.M. 423, 457 P.2d 220 (Ct.App.1969); *Kramer v. McDonald's System, Inc.*, 61 Ill.App.3d 947, 19 Ill.Dec. 21, 378 N.E.2d 522 (1978), *affirmed* 77 Ill.2d 323, 33 Ill.Dec. 115, 396 N.E.2d 504 (1979).

■ To be legally enforceable, an assignment must describe the subject matter with sufficient particularity to render it capable of identification. *Nickell v. United States ex rel. D.W. Falls, Inc.*, 355 F.2d 73 (10th Cir.1966). The intent of an assignor is to be gleaned, if possible, from the document itself. *Seasons, Inc. v. Atwell*. The meaning of an assignment is to be determined with reference to the intention of the drafter at the time the agreement was made. *E.g., Young v. Thomas*, 93 N.M. 677, 604 P.2d 370 (1979) (if there is ambiguity, intent may be ascertained by language and conduct of parties, objects

sought to be accomplished by the agreement, and circumstances surrounding execution of the agreement).

In construing an assignment, as in the construction of contracts generally, when the words employed are free from ambiguity, there is no occasion for interpretation. Absent ambiguity reflected in the wording of the instrument, it is the court's duty to give effect to the language of the entire document in accordance with the commonly accepted and ordinary meaning of the words. *Broyles v. Iowa Department of Social Services*, 305 N.W.2d 718 (Iowa 1981).

In the present case, substantially all the evidence is documentary so we may independently examine and weigh it. *In re Estate of Hilton*, 98 N.M. 420, 649 P.2d 488 (Ct.App.), *cert. denied*, 98 N.M. 478, 649 P.2d 1391 (1982). The words "Assigned to Bruce Benton 10/11/56," import a present assignment of decedent's interest in the partnership to the plaintiff. The remaining language: "In case of my death, Isobel Suber may liquidate this partnership by paying $10,000 in addition to the $10,000 mortgage which was later made on this property," does not imply an intent to make a will on the part of plaintiff's father, but merely recites a statement by him indicating the conditions under which the partnership could be terminated after his death. This language simply tracks existing partnership law. The death of a partner effects a dissolution of the partnership. NMSA 1978, § 54–1–31(D).

The assignment by decedent of his partnership interest divested him of any partnership interest in the realty held by the partnership. Sections 54–1–25, –27. The decedent's subsequent deed and holographic will affecting the partnership realty were therefore invalid. *See Martinez v. Martinez*, 98 N.M. 535, 650 P.2d 819 (1982) (once valid assignment made, assignor may not defeat or impair rights of assignee). The partnership was dissolved at the time of the assignment to plaintiff of his father's interest in the partnership. Al-

though an assignment does not itself dissolve the partnership, Section 54–1–27(A), a general partnership, in the absence of written provisions to the contrary, cannot exist with less than two members. NMSA 1978, § 54–1–6. *Seigel v. Kaplan*, 43 Ohio App.2d 171, 334 N.E.2d 520 (1975). The death of a partner also effects a dissolution of the partnership. Section 54–1–31(D). *See also Girard Bank v. Haley*, 460 Pa. 237, 332 A.2d 443 (1975). Upon learning of the assignment of Benton's partnership interest to plaintiff, Suber had the duty to proceed in good faith on behalf of the partnership to wind up its affairs. NMSA 1978, § 54–1–37; *County National Bank of North Miami Beach v. Stern*, 287 So.2d 106 (Fla.App.1973); *cert. denied*, 300 So.2d 896 (Fla.1974). After the winding up of the partnership, unless one or more of the defenses are upheld, plaintiff should have received his due portion of the partnership property and assets. NMSA 1978, §§ 54–1–37, –38, –40.

Defendants argue that the trial court properly found the assignment to be testamentary in nature and fatally deficient on technical grounds. Plaintiff contends that there was no legal or factual basis to support the trial court's findings that the 1956 assignment of his father's partnership interest constituted an invalid last will and testament.

The determinative factor in ascertaining whether or not an instrument is testamentary in nature, is whether the maker intended the instrument to constitute a testamentary disposition to take effect in the event of his death. *Matter of Kelly's Estate*, 99 N.M. 482, 660 P.2d 124 (Ct.App.1983). The intention to make a will is that which is manifest, either expressly from the language of the will or impliedly from the circumstances surrounding the execution of the document. *Id.* Where the testamentary intent of the maker of a document is uncertain or doubtful the fact finder must determine the intention of the maker from all of the evidence. *Halldin v. Usher*, 49 Cal.2d 749, 321 P.2d 746 (1958) (en banc).

The language "[a]ssigned to Bruce Benton" is unambiguous and imports an intention to effect an *inter vivos* assignment. The second sentence containing the phrase "[i]n case of my death," was a condition of dissolution of the partnership and did not affect the present transfer of the assignment. An assignment which conveys a present interest of the assignor is not testamentary. *See Robertson v. Robertson*, 147 Ala. 311, 40 So. 104 (1905). *See also* 1 S. Rowley, *Rowley on Partnership*, § 31.1(c) (2nd ed. 1960).

Defendants have not cited any evidence other than the wording of the document and plaintiff's inaction until the filing of this suit to support the trial court's finding that the assignment was intended by decedent to be a testamentary disposition. The trial court's finding that the assignment was an invalid testamentary disposition is without proper evidentiary support. A trial court's finding which is not supported by substantial evidence and which has been properly challenged cannot be sustained upon appeal. *Henderson v. Lekvold*, 99 N.M. 269, 657 P.2d 125 (1983); *Getz v. Equitable Life Assurance Society of the United States*, 90 N.M. 195, 561 P.2d 468, *cert. denied*, 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977).

Absent a valid finding that the assignment from decedent to plaintiff constituted a void testamentary disposition, the assignment must be given valid legal effect, unless plaintiff is barred by laches, estoppel, or waiver. Defendants also argue that plaintiff's inaction following his father's death supports the trial court's findings that plaintiff should be precluded from prosecuting the present suit on the grounds of laches, estoppel, or waiver. The trial court found that plaintiff's failure to dispute Suber's ownership interest in the realty and to assert his claim in his father's estate bar him from any right in the property.

The findings adopted by the trial court indicate that Suber had actual notice of the partnership agreement and had constructive notice of its assignment in 1956 to plaintiff. The court further found that a routine title search of the Bernalillo County records would have disclosed the fact of the assignment of decedent's partnership interest. Under these circumstances, the trial court's findings of estoppel, laches, and waiver grounded upon plaintiff's conduct are conflicting as to whether plaintiff can now assert an interest in partnership assets over and above the debts and expenses of the partnership. The trial court found constructive notice of the 1956 assignment in 1968. Plaintiff did nothing both before and after 1968. What was the effect of plaintiff's lack of action both before and after 1968? Was the ruling that plaintiff was barred based solely on pre-1968 inaction; was the 1968 notice of no significance to the trial court? We cannot determine from the findings what the trial court meant. Further, the trial court concluded that plaintiff was barred "under equitable laches, estoppel, waiver, and collateral estoppel." This is insolubly ambiguous. This case must be returned to the trial court for findings and conclusions sufficient for a meaningful review of a ruling barring a recovery by plaintiff.

If, upon remand, the trial court rules that plaintiff is not barred from recovery, then the maximum recovery is fixed by findings made by the trial court at *plaintiff's* request. *See Platero v. Jones*, 83 N.M. 261, 490 P.2d 1234 (Ct.App.1971).

Earlier we quoted the wording of the assignment. It provided for "liquidation" of the partnership by Suber's payment of $10,000 in addition to a $10,000 mortgage. The trial court found that Suber had paid the $10,000 mortgage, or it was otherwise taken care of "such that it ceased to be a condition to satisfy before ... Suber could elect to liquidate the partnership." The trial court also found, at plaintiff's request, that plaintiff "was obligated to advise ... Suber of the options given to her to liquidate the partnership, that [plaintiff] did not do so." "That had [plaintiff] advised ... Suber of the option to liquidate the partnership, she would have."

Plaintiff's silence in the face of his obligation and the result that would have followed if Suber had been advised, limits plaintiff's claim to a maximum of $10,000 as provided in assignment. *Mosley v. Magnolia Petroleum Co.*, 45 N.M. 230, 114 P.2d 740 (1941); *see also Capo v. Century Life Insurance Co.*, 94 N.M. 373, 610 P.2d 1202 (1980).

Even though $10,000 is the maximum amount recoverable, should plaintiff not be barred from recovery, this does not mean that plaintiff may recover that amount. The trial court must determine whether the $10,000 to be paid in liquidation was to be paid to the partnership as an entity or to plaintiff as assignee of his father's share in the partnership. Under the facts of this case, it makes a $5,000 difference.

Ordinarily we would remand to the trial court for clarification of the trial court's findings. However, the judge who tried this case is no longer on the bench. In this circumstance, we remand for a new trial. *Curbello v. Vaughn*, 78 N.M. 489, 432 P.2d 845 (1967); *Louis Lyster, General Contractor, Inc. v. Town of Las Vegas*, 75 N.M. 427, 405 P.2d 665 (1965).

The judgment is reversed and the cause is remanded for a new trial in accordance with this opinion.

No costs are awarded on appeal.

IT IS SO ORDERED.

WOOD and ALARID, JJ., concur.